# United States Court of Appeals

### For the Eighth Circuit

_____

No. 11-3037

_____

Shannon Jacks

*Plaintiff - Appellee*

v.

Meridian Resource Company, LLC; Blue Cross Blue Shield, of Kansas City

*Defendants - Appellants*

------------------------------

Association of Federal Health Organizations

*Amicus on Behalf of Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: June 12, 2012
Filed: December 17, 2012

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

BEAM, Circuit Judge.

Meridian Resource Company and Blue Cross Blue Shield–Kansas City (hereinafter BCBS-KC collectively) appeal the district court's remand based upon the local controversy exception to the Class Action Fairness Act (CAFA), its determination that federal common law was not contemplated in this action, and its decision that BCBS-KC could not remove this matter under the federal officer removal statute. We vacate the district court's judgment and remand the case for further consideration consistent with this opinion.

## I.   BACKGROUND

The Federal Employees Health Benefits Act of 1959[1] (FEHBA) establishes a comprehensive program of health insurance for federal employees and charges the United States Office of Personnel Management (OPM) with negotiating contracts with private insurance carriers to provide an array of health-care plans. Empire HealthChoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 682 (2006). "Largest of the plans for which OPM has contracted, annually since 1960, is the Blue Cross Blue Shield Service Benefit Plan (Plan), administered by local Blue Cross Blue Shield companies [such as BCBS-KC]." Id. Appellant BCBS-KC administers the Plan in Missouri. FEHBA provides that the government pays about 75% of health-plan premiums and the enrollee pays for the rest. 5 U.S.C. § 8906(b). Premiums thus shared are deposited in a special Treasury Fund, from which carriers draw to pay for covered benefits. Id. § 8909(a). Meridian Resource Company is a vendor, based in Wisconsin, that provides subrogation and reimbursement services for BCBS-KC, as well as many other BCBS Plan administrators in other locales.

FEHBA requires that contracts between OPM and carriers "contain a detailed statement of benefits offered," including "such maximums, limitations, exclusions, and other definitions of benefits as [OPM] considers necessary or desirable," and

---

[1]5 U.S.C. §§ 8901-8914.

allows OPM to "prescribe reasonable minimum standards for health benefits plans [and carriers]." 5 U.S.C. § § 8902(d), (e). Concerning reimbursement and subrogation, matters FEHBA itself does not address, the Plan's Statement of Benefits reads in part:

> If another person or entity . . . causes you to suffer an injury or illness, and if we pay benefits for that injury or illness, you must agree to [the following]: All recoveries you obtain (whether by lawsuit, settlement, or otherwise), no matter how described or designated, must be used to reimburse us in full for benefits we paid. Our share of any recovery extends only to the amount of benefits we have paid or will pay to you or, if applicable, to your heirs, administrators, successors, or assignees.

If the insured does not voluntarily reimburse under these terms, the Plan requires the carrier to make a "reasonable effort to seek recovery of amounts . . . it is entitled to recover in cases . . . brought to its attention," and gives the carrier discretion to file suit in federal court to enforce its rights. "Pursuant to the OPM-BCBSA [Blue Cross Blue Shield Association] master contract, reimbursements obtained by the carrier must be returned to the Treasury Fund." Empire, 547 U.S. at 685.

In 2007, Shannon Jacks, a Missouri resident, was in a motor vehicle accident and received benefits from BCBS-KC for her injuries. Jacks subsequently asserted a personal injury claim against the third-party tortfeasor, reached a settlement, and recovered funds for her injuries. BCBS-KC asserted a lien on Jacks' third-party award in an amount equal to the amount BCBS-KC had paid on her behalf for the injuries she sustained in the accident. Jacks sued BCBS-KC in Jackson County, Missouri, on behalf of herself and others similarly situated alleging Missouri state law violations. Missouri has laws prohibiting subrogation.

The crux of this suit challenges the application, in Missouri, of the provision in the Plan administered by BCBS-KC that requires a Plan enrollee who receives

-3-

benefits in connection with any injury in addition to compensation from a third party must reimburse BCBS-KC the amount of benefits paid.  Given the state's anti-subrogation laws, Jacks contends that BCBS-KC is unable to recover its reimbursement lien in Missouri.

BCBS-KC removed the action to federal district court, citing three grounds in support:  (1) CAFA, 28 U.S.C. § 1332(d); (2) 28 U.S.C. § 1441 federal question jurisdiction on the ground that Jacks' claims "turn on the construction of federal common law and otherwise raise substantial issues of federal law;" and (3) 28 U.S.C. § 1442(a)(1), the federal officer removal statute.  Jacks moved to remand the matter to state court, and the district court granted the motion.  BCBS-KC appealed.  The bases for Jacks' motion and the district court's remand are discussed in turn below, as appropriate, in juxtaposition with our analyses.  The sole question on appeal concerns where this action will be adjudicated as between the available state and federal courts.

## II.    DISCUSSION

### A.    Jurisdiction on Appeal

The parties first dispute whether this court has jurisdiction to hear all of the issues presented by this appeal.[2]  Jacks concedes that jurisdiction lies to review the district court's remand under the local controversy exception of CAFA, but without citation to supporting authority, claims that this panel lacks jurisdiction to address the remainder of the district court's order.  The basis on which Jacks grounds this latter

---

[2]We initially denied Appellants' appeal under 28 U.S.C. § 1453(c) (a provision of CAFA allowing for appeals from remand orders within certain time restraints notwithstanding § 1447(d)'s proscriptions), disposing of that alternate request in case number 11-8023.  Accordingly, we now address Appellants' appeal as of right under 28 U.S.C. § 1291.

argument is wholly unclear. BCBS-KC simply counters that because this is an appeal from a final order under § 1291, this court has jurisdiction over the entire order. Neither argument carries the day but jurisdiction lies nonetheless.

Section 1447(d) generally provides that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." Despite this broadly worded prohibition, the Supreme Court has held that § 1447(d) only bars appellate review of a district court's remand order that is "based on a ground specified in [28 U.S.C.] § 1447(c)." Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 638 (2009). This means that "remand orders based on a procedural defect or lack of subject matter jurisdiction are unreviewable." Carlson v. Arrowhead Concrete Works, Inc., 445 F.3d 1046, 1050 (8th Cir. 2006). A remand order that is based on some other, non-section 1447(c) ground is a final decision appealable under 28 U.S.C. § 1291. See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 713, 715 (1996).

The district court remanded this matter, in part, based upon its interpretation of the local controversy exception in CAFA, which operates as an abstention doctrine and does not divest the district court of subject matter jurisdiction. Graphic Commc'ns Local 1B v. CVS Caremark Corp., 636 F.3d 971, 973 (8th Cir. 2011). "The local controversy provision, which is set apart from the . . . jurisdictional requirements in the statute, inherently recognizes the district court has subject matter jurisdiction by directing the court to 'decline to exercise' such jurisdiction when certain requirements are met." Id. Accordingly, § 1447(d) interposes no bar to appellate review and the order is final and appealable as a collateral order under § 1291 on that issue. Quackenbush, 517 U.S. at 711-14.

In light of this § 1447(d) jurisprudence, however, we do lack jurisdiction to review the district court's determination concerning the availability of federal common law to resolve this suit, given the above analysis regarding § 1447(d), as it

is a remand based upon the court's determination that it lacked subject matter jurisdiction. Nonetheless, we retain jurisdiction to review the district court's remand on the issue of whether the federal officer removal statute, 28 U.S.C. § 1442(a)(1), applies. The plain language of § 1447(d) governs this final analysis. See 28 U.S.C. § 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court . . . pursuant to section 1442 . . . shall be reviewable by appeal or otherwise."). Accordingly, we have jurisdiction to address two of the three bases relied upon by the district court to support remand of this action.

## B.    Removal Jurisdiction

Noted previously, BCBS-KC removed this action from Missouri state court, citing three bases in support of removal–each one, if valid, is independently sufficient to support removal. The district court rejected each separately in its order and remanded the matter. On appeal, then, reversal of any one basis rejected by the district court supports retention of this matter in federal court, although, noted above, only two fall within our appellate purview. Because we hold that the federal officer removal statute applies, we reverse the district court's order and remand for further consideration.

Title 28 U.S.C. § 1442(a)(1) "grants independent jurisdictional grounds over cases involving federal officers where a district court otherwise would not have jurisdiction." Johnson v. Showers, 747 F.2d 1228, 1229 (8th Cir. 1984) (quotation omitted). Section 1442 allows removal to a federal forum of any civil or criminal action against "[t]he United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." 28 U.S.C. § 1442(a)(1) (emphasis added). Four elements are required for removal under §

-6-

1442(a)(1): (1) a defendant has acted under the direction of a federal officer, (2) there was a causal connection between the defendant's actions and the official authority, (3) the defendant has a colorable federal defense to the plaintiff's claims, and (4) the defendant is a "person," within the meaning of the statute. Dahl v. R.J. Reynolds Tobacco Co., 478 F.3d 965, 967 n.2 (8th Cir. 2007). While not limitless, "[t]he words 'acting under' are broad," and the Supreme Court "has made clear that the statute must be 'liberally construed.'" Watson v. Philip Morris Cos., Inc., 551 U.S. 142, 147 (2007) (quoting Colorado v. Symes, 286 U.S. 510, 517 (1932)).

The district court rejected removal under § 1442(a)(1), determining that a provider's act of pursuing subrogation and reimbursement from a plaintiff was not sufficiently under the control of a federal officer or agency for purposes of federal officer removal. We disagree.

It is the first (acted under) and third (colorable federal defense) elements noted above that are critical to the instant analysis.[3] To satisfy the "acted under" requirement of § 1442(a)(1), a private person's actions "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." Watson, 551 U.S. at 152. It is not enough that a private person or entity merely operate in an area directed, supervised and monitored by a federal regulatory agency or other such federal entity. Id. at 145.

---

[3]As to the causal connection, the acts that form the predicate of Jacks' petition unquestionably occurred while BCBS-KC performed its duties under the direction of a federal officer or agency. It was because of the Plan that BCBS-KC pursued subrogation. See Isaacson v. Dow Chemical Co., 517 F.3d 129, 137 (2d Cir. 2008) ("The hurdle erected by this requirement is quite low."). And, the "person" contemplated by the federal officer removal statute includes corporations. See Watson, 551 U.S. at 152-53 (interchangeably discussing a "private person" and "company" when analyzing the relevant relationship under the federal officer removal statute). The second and fourth elements, then, are satisfied.

In Watson, the plaintiffs filed a state-court suit against Philip Morris, claiming that the company violated Arkansas consumer laws by advertising certain cigarette brands as "light" when, in fact, Philip Morris manipulated federally mandated testing results to register lower levels of tar and nicotine in the advertised cigarettes than would be delivered to consumers. Id. at 146-47. Philip Morris removed the case under the federal officer removal statute and the lower court authorized removal, holding that the case attacked Philip Morris's use of the government's method of testing cigarettes and thus the action involved an attack on actions taken by Philip Morris under the direction of the Federal Trade Commission (FTC). Id. Or, stated differently, that the FTC engaged in detailed supervision of Philip Morris's activities and thus Philip Morris "acted under" the FTC for purposes of the statute. Id. The Supreme Court reversed. Id. at 145.

In Watson, the Court looked to the statute's language, context, history, and purposes to inform the analysis regarding just how broadly the federal officer removal statute should be applied. Id. at 147-53. The Court relayed the history of the federal officer removal statute and pointed out that the "'basic' purpose [of the statute] is to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arres[t]' and bring 'to trial in a State cour[t] for an alleged offense against the law of the State,' 'officers and agents' of the Federal Government 'acting . . . within the scope of their authority.'" Id. at 150 (first alteration added) (quoting Willingham v. Morgan, 395 U.S. 402, 406 (1969)). There are times that state court proceedings reflect local prejudice against unpopular federal laws or federal officials. Id. States hostile to the federal government may impede through delay, federal revenue collection or the enforcement of other federal law. Id. Too, states may deprive federal officials of a federal forum in which to assert federal immunity defenses. Id. Very generally, then, the federal officer removal statute was designed to avert various forms of state court prejudice against federal officers or

-8-

those private persons acting as an assistant to a federal official in helping that official carry out federal law.  Id. at 151.

Within the context of that historical rubric, Watson established that not all relationships between private entities or individuals and the federal government suffice to effect removal under the federal officer removal statute. In order to fall within the scope of the federal officer removal statute, "[t]he assistance that private contractors provide federal officers [must go] beyond simple compliance with the law and help[] officers fulfill other basic governmental tasks." Id. at 153.  Taxpayers who fill out complex federal tax forms, or airline passengers who obey federal regulations prohibiting smoking certainly "help" or "assist" the federal law enforcement authorities in some sense of those words, but these individuals do not "act under" an agency or officer of the federal government for purposes of removal under the statute. Id. at 152.  In contrast, the production of Agent Orange by a private defense contractor, Dow Chemical, to help the government conduct a war is an example of the sort of assistance contemplated by the statute.  Id. at 153-54 (citing Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387 (5th Cir. 1998)).

"Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." Watson, 551 U.S. at 153.  In analyzing the relationship necessary for purposes of § 1442(a)(1), the Court distinguished entities doing business in areas subjected to intense regulation–which could not remove an action under the statute on that basis alone–with private contractors under close supervision by the federal government, which could:

> The answer to this question lies in the fact that the private contractor in [cases where close supervision by a federal officer or agency is sufficient,] is helping the Government to produce an item that it needs.

The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks. In the context of Winters, for example, Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.

Id. at 153-54. This examination sufficiently answered the question in Watson–a case where private contracting was not at issue.

Requiring more than mere compliance (or noncompliance) with federal laws, rules, and regulations to support removal under the federal officer removal statute–even if highly detailed, and even if the private firm's activities are highly supervised and monitored–makes sense. Indeed, inclusion of entities or individuals merely complying with federal law would considerably expand the scope of the federal officer removal statute, "potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." Id. at 153.

There are diverging views as to whether the federal officer removal statute applies to the multifarious instances involving disputes, such as we have here, between federal employee members and their respective carriers contracting under the FEHBA. The district court in this case relied upon Van Horn v. Arkansas Blue Cross and Blue Shield, 629 F. Supp. 2d 905 (E.D. Ark. 2007), which similarly involved a reimbursement issue. In Van Horn, the district court denied application of § 1442(a)(1) for the reasons advocated by Jacks in this case–holding that because the exercise of any subrogation rights was discretionary on the part of the carrier under the Plan, any decision to seek subrogation was not done under the direction of a federal agency or officer. 629 F. Supp. 2d at 914-15; see also Orthopedic Specialists of New Jersey v. Horizon Blue Cross/Blue Shield of New Jersey, 518 F. Supp. 2d

128, 137-38 (D.N.J. 2007) (denying removal under the federal officer removal statute because the "complained-of activity," i.e., the plaintiff's promissory estoppel claim concerning a purportedly erroneous pre-authorization, was unrelated to the provision of benefits under the terms of the Plan promulgated by OPM, did not otherwise concern the terms of the contract, and thus was not done under the direct and detailed control of a federal agency or officer). In two other instances, the matter has been addressed, and rejected on similar authority, in Missouri district courts. Morris v. Humana Health Plan, Inc., 829 F. Supp. 2d 848 (W.D. Mo. 2011); Nevils v. Group Health Plan, Inc., No. 4:11 CV 588 DDN, 2011 WL 8144366 (E.D. Mo. June 15, 2011) (unpublished).

We take a different view. The legislative history of the FEHBA demonstrates that Congress's purpose was to establish a health benefits program for federal employees, so as to compete for the best talent along with private companies. H.R.Rep. No. 86-957, at 2 (1959); 1959 U.S.C.A.A.N. 2913, 2914.

> Availability of this health protection program to Government employees will be of material assistance in improving the competitive position of the Government with respect to private enterprise in the recruitment and retention of competent civilian personnel so urgently needed to assist in maintaining and improving our strong national defense and in the operation of other essential Government programs.

Id. "To achieve that end, Congress sought to set up a partnership between OPM and private carriers." Houston Cmty. Hosp. v. Blue Cross and Blue Shield, 481 F.3d 265, 271 (5th Cir. 2007) (discussing the legislative history of the FEHBA and holding that a determination regarding whether BCBS is a "person acting under" a federal officer for purposes of removal under the federal officer removal statute is inapposite in the query whether that same entity is entitled to official immunity and protection from suit altogether). "OPM is 'responsible for the overall administration of the program

-11-

while sharing the day-to-day operating responsibilities with the employing agencies and the insurance carriers.'" Id. (quoting H.R.Rep. No. 86-957, at 2 (1959)). Accordingly, BCBS-KC, and other similar entities, help the government fulfill the basic task of establishing a health benefits program for federal employees. OPM has direct and extensive control over these benefit contracts under the FEHBA. One elementary but illuminating example of the close relationship giving rise to removal here, though not dispositive of the issue by any stretch, can be found on the "Blue Cross and Blue Shield Service Benefit Plan" brochure received by enrolled federal employees. On the front page of the brochure, next to the affixed government seal, the brochure itself notes that it is "authorized for distribution by the United States Office of Personnel Management."

Unlike Watson, where the Court denied removal under the statute because Philip Morris operated under federal regulation, not delegation, there *is* evidence in the instant case that by way of the FEHBA, the federal government has sufficiently "delegated" authority to these carriers to undertake the task of insuring federal employees. Watson, 551 U.S. at 156-57. Likewise, there *is* evidence of contracts, payments, and other such relational evidence sufficient to support removal here. Id. (noting that even though Philip Morris used the word "delegation" in its attempt to characterize its alleged relationship with the FTC, there was no evidence of a special relationship–no evidence of any delegation of legal authority, nor evidence of any contract or any payment, leaving only the conclusion that, again, Philip Morris conducted business under the regulation, not delegation, of the federal government).

To be sure, the delegation discussed in this case is the pursuit of subrogation, or not, on the part of the carrier. When they enroll in the FEHBA program, federal employees necessarily subscribe to the OPM standard contract and Statement of Benefits (which make up the Plan) approved by OPM for their respective Plans. Noted earlier, the Plan includes the subrogation and reimbursement provisions that

are the subject of this suit. That the Plan allows the carrier the discretion to pursue subrogation does not foreclose the application of the federal officer removal statute. To do so parses the analysis too finely–these carriers "act under" the federal government for purposes of this statute. In fact, broadly speaking, the subrogation provision is necessarily a product of the benefit payment process, a process over which OPM exerts regulatory control. See 48 C.F.R. § 1631.201-70. Too, federal regulations provide that the federal agency will resolve disputes about an enrolled employee's coverage. 5 C.F.R. § 890.105(a)(i); see also 5 U.S.C. § 8902(j) (requiring carrier to provide health benefit if OPM concludes that enrollee is entitled to the benefit under the contract). The carrier's assistance to the federal government in all respects in no way can be described as simple compliance with a federal law, but rather it has been delegated particular authority by OPM, as previously discussed. See Bennett v. MIS Corp., 607 F.3d 1076, 1087-88 (6th Cir. 2010) (pointing out that in addition to detailed mold abatement specifications established by the Federal Aviation Administration, the federal contracts provided for federal officers to closely monitor and supervise MIS's work and could direct the activities in limited ways, all of which supported removal under § 1442(a)(1)).

To deny removal solely because the carrier is allowed discretion within a minute area contemplated by the governmental Plan defies the overall purpose and thrust of the federal officer removal statute generally. At all times, the carrier is subject to OPM oversight, uniquely operates with the United States Treasury, submits to OPM's regulatory requirements, and ultimately answers to federal officers. Accord Anesthesiology Assocs. of Tallahassee, FL, P.A. v. Blue Cross Blue Shield of Florida, Inc., No. 03-15664, 2005 WL 6717869, at *2 (11th Cir. Mar. 18, 2005) (unpublished) ("A health plan insurer contracting with a government agency under a federal benefits program is considered a 'person acting under' a federal officer."). We remain mindful as well that at all times, if OPM finds an insurer's performance wanting, it can withdraw approval of that carrier or terminate its contract. 5 C.F.R.

-13-

§ 890.204. All of these factors support the conclusion that BCBS-KC's assistance goes well beyond simple compliance with the law for purposes of removal under § 1442(a)(1). Watson, 551 U.S. at 153.

Contrary to Jacks' assertion on appeal, allowing BCBS-KC to remove this action in these circumstances does not result in a "broad and limitless interpretation" of the federal officer removal statute. See id. at 154-57 (using cigarette companies as exemplary of companies operating in a highly regulated arena, which would not be allowed, on that basis alone, to invoke the federal officer removal statute when litigation ensued). In fact, removal here is in accord with the boundaries established by Watson, which, as noted by the Court, did not involve private contracting such as we have here. Id. at 154.

By way of this ruling, we do not open the federal door to all private firms doing business in industries that are highly regulated by the federal government. Nor does our conclusion rest upon the fact that the FEHBA creates a highly regulated arena wherein the OPM supervises and monitors many aspects of the provider's activities. Indeed, noted earlier, Watson clearly establishes that "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." Id. at 153. As a private contractor, BCBS-KC is helping the government to produce an item that it needs–the basic governmental task of providing health benefits for its employees.

We thus conclude that FEHBA program carriers contracting with the federal government to provide health care insurance for federal employees are not unrelated and wholly separate business entities merely doing business in a highly regulated arena, but rather conduct business under the delegation of the federal government. That the federal government maintains the funds for all carriers participating under the FEHBA only adds further support to this conclusion. For example, pursuant to 5 U.S.C. § 8909, the funds received by carriers through these subrogation efforts

-14-

where the insured receives payment from a third party, are required to be credited to the Employees Health Benefits Fund, held by the Treasury of the United States.

Finally, in order to remove under § 1442(a)(1), BCBS-KC must establish a colorable federal defense to Jacks' claims. This element, too, is satisfied. BCBS-KC has a colorable defense that Jacks' claims are preempted by FEHBA's express preemption provision, 5 U.S.C. § 8902(m)(1), which provides that the terms of FEHBA contracts concerning benefits and benefits payments shall supersede state law. Empire, 547 U.S. at 697-98 (analyzing the same in relevant context). BCBS-KC additionally points out that it has a colorable defense that sovereign immunity applies on these facts, or that Jacks' claims are displaced by federal common law. See Hagemeier v. Block, 806 F.2d 197, 202 (8th Cir. 1986); Boyle v. United Techs. Corp., 487 U.S. 500, 507 (1988).

We do not require that these defenses be clearly sustainable in order to support removal under § 1442(a)(1). Willingham, 395 U.S. at 406-07 ("[The federal officer removal statute] is broad enough to cover all cases where federal officers can raise a colorable defense . . . . The officer need not win his case before he can have it removed."). Neither does our lack of precedent regarding the availability of the Boyle defense to non-military service contractors defeat the plausibility of the defense. Bennett, 607 F.3d at 1089 (looking at our sister circuits for guidance on this very issue). "One of the primary purposes of the removal statute–as its history clearly demonstrates–*was to have such defenses litigated in the federal courts*." Id. at 1085. While these defenses are indeed colorable, we make no determination as to their merits. We simply hold that a federal forum is available to adjudicate this matter.

**III.   CONCLUSION**

As stated at the beginning of our analysis, because we determine that this matter is properly in federal court under the federal officer removal statute, we need not address Jacks' remaining claims.  That said, we do not delve into the CAFA claim, but rather reverse the district court's judgment and remand this matter for further consideration, directing that this action remain in federal court.

———————————————